**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DANNY RAY MEEKS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:12-cv-545** |
| | ) | |
| **DERRICK D. SCHOFIELD et al.,** | ) | **Judge Trauger** |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION</u>**

Before the court are the plaintiff's objections to the Report and Recommendation ("R&R") (ECF No. 363) issued by Magistrate Judge John Bryant recommending that the defendants' motion for summary judgment (ECF No. 284) be granted.

In addition to the defendants' motion for summary judgment and the plaintiffs' objections thereto, numerous other motions are also pending at this time, including the defendants' motion to strike the affidavit of William Shatswell (ECF No. 303); the plaintiff's "Motion for Leave of the Court to File Comprehensive Amendment Pursuant to Fed. R. Civ. Proc. 15(a)(2) as Justice So Requires," seeking to supplement the complaint to allege "additional and continuing violations of the Americans with Disabilities Act" (ECF No. 320) along with two additional motions asking the court to grant that motion (ECF Nos. 353, 355); and the plaintiff's "Motion for Court to Grant Plaintiff a Copy of TDOC/ADA Compliance Guide, Volumes I and II" (ECF No. 356).

Insofar as these motions may be germane to the motion for summary judgment, the court finds it prudent to address them at this juncture. The plaintiff has sought repeatedly to amend his complaint, and the present motions reiterate arguments that have already been rejected. The motion to amend (ECF No. 320) and the additional motions asking that the court grant that motion (ECF Nos. 353, 355) will therefore be denied. The motion for a copy of the ADA Compliance Guide (ECF No. 356) will be denied as moot, discovery in this action having been completed. And the defendants' motion to strike the declaration of William Shatswell (ECF No. 303) will be denied on the basis that neither the defendant's motion nor the attached exhibit is verified. Notwithstanding, the court does not find Shatswell's declaration to be material

to the motion for summary judgment.

Regarding the plaintiff's objections to the R&R, when a magistrate judge recommends the disposition of a motion for summary judgment, the district judge must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(B). *See also* Fed. R. Civ. P. 72(b) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."). The plaintiff has filed voluminous objections to the R&R, essentially objecting to every finding of fact and conclusion of law in the R&R. Rather than attempt to interpret and respond to each individual objection in the plaintiff's fifty-one-page document, the court has considered *de novo* the defendants' motion for summary judgment.

Having conducted such a review, the court finds, for the reasons set forth herein, that the defendants are entitled to summary judgment in their favor as to all claims asserted against them. Their motion will be granted and this matter dismissed in its entirety.

I.      **PROCEDURAL BACKGROUND AND PLAINTIFF'S FACTUAL ALLEGATIONS**

Plaintiff Danny Ray Meeks, a prisoner proceeding *pro se* and *in forma pauperis*, filed this action asserting claims under 42 U.S.C. § 1983, the Americans with Disabilities Act 42 U.S.C. § 12101, *et seq.* ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, et seq. ("RA"), and Title VII of the Civil Rights Act of 1964 ("Title VII"). The plaintiff seeks declaratory and injunctive relief as well as compensatory and punitive damages. The defendants named in the original verified complaint included Derrick Schofield, Commissioner of the Tennessee Department of Correction ("TDOC"), Mike Christensen, the ADA officer at the Lois M. DeBerry Special Needs Facility ("DSNF") in Nashville, Tennessee, Chris Abingambe (incorrectly spelled as "Aibangbee" in the original complaint), Dennis Davis, identified as a Grievance Board Chairman at DSNF, and TDOC itself. (ECF No. 1.)

Meeks alleges that he suffers from paruresis, a mental anxiety disorder that makes it very difficult for him to urinate without complete privacy. He claims that defendant Mike Christensen knew he suffered from this disorder and that, in the spring of 2011, Christensen was disgruntled with the plaintiff because he had been required to make available to the plaintiff the ADA Compliance Guide ("ADA/CG") used by TDOC, as a result of a discovery order issued in another federal lawsuit in which the plaintiff was involved at that time. The plaintiff claims that Christensen had the doors removed from the bathrooms in the

plaintiff's housing unit, knowing that this would cause the plaintiff great distress, in retaliation for the plaintiff's having obtained discovery of the ADA/CG. Upon initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A, the court found that the plaintiff's claim that defendant Christensen caused the removal of the bathroom doors stated a cognizable retaliation claim under § 1983. (ECF No. 5, at 3). The court also found that the complaint stated a potentially viable claim against defendant Davis under 42 U.S.C. § 1983 for violation of plaintiff's right to privacy, as a result of Davis's alleged disclosure of the plaintiff's paruresis to other inmates. The court allowed Meeks's related claims under the ADA and the RA to survive against TDOC, but dismissed claims under these two statutes against the individual defendants upon a finding that, as a matter of law, neither the ADA nor the RA authorized suit against public employees or supervisors in their individual capacities. (ECF No. 5, at 4.) The claims against the remaining defendants were dismissed for failure to state a claim. (*Id.* at 6.) The matter was referred to the magistrate judge for case management and decisions on all non-dispositive pretrial matters and for issuance of a Report & Recommendation on any dispositive matters.

After referral and before the defendants answered, the plaintiff filed an amended verified complaint supplementing his original claims against defendant Davis and including new claims against defendants Julia Campbell, Housing Unit Supervisor of Unit 15 and Chair of the DSNF Disciplinary Board, and DSNF Warden Jewel Steele. (ECF No. 28.) In his amended complaint, the plaintiff states that he asked Chris Abingambe in August 2011 why he was being transferred from the "support staff housing unit" (Unit 4) to a "medical housing unit" (Unit 15) and was told that, if he wanted to remain in Unit 4, he needed to "drop his lawsuit and stop filing grievances about the removal of the bathroom doors." (ECF No. 28, at 6 ¶ 12.) In other words, in the amended complaint, Meeks alleges that the transfer to Unit 15 was not only a violation of the ADA but also was in retaliation for his ADA complaints regarding the removal of the bathroom doors. Meeks alleges that he pleaded with defendant Christensen to replace just one bathroom door instead of moving him to Unit 15, but Christensen refused, stating, "As long as I am the FSO/ADA Officer there will be no bathroom doors in Units 3 and 4. I made the decision to move you to unit 15 and that is how it is going to stay. . . . You do not run anything around here and it's time you realized that." (*Id.* ¶ 13.) Meeks was moved to Unit 15 shortly thereafter.

The plaintiff alleges that the ADA/CG was still in his possession, and the other lawsuit remained

pending, on November 3, 2011, when defendant Julia Campbell conducted a search of the plaintiff's cell in Unit 15. During this search, Campbell seized the plaintiff's copy of the ADA/CG along with other legal materials in his possession that pertained to other inmates. On the same day, Campbell searched another inmate's cell but did not seize any of the legal material in that inmate's possession. Although the plaintiff insists he was an "approved legal helper," he apparently did not dispute that he was in violation of prison policy permitting an inmate to provide legal assistance to only one other inmate at a time and only if the warden has given prior written consent. (*See* Am. Complaint, ECF No. 28, at 13 ¶ 38 ("Plaintiff is not challenging the intrinsic correctness of the disciplinary board's decision. . . .").) He also concedes that he was disciplined for being in possession of other inmates' legal materials in violation of prison regulations and that the decision of the disciplinary board was upheld on appeal. He insists that his dispute with the board's decision is that it violated his "constitutionally protected First Amendment right of access to file his grievances into the courts." (*Id.* at ¶ 39.)

He further indicates, however, that the other inmate whose cell was searched the same day, Donald Jett, was also improperly in possession of other inmates' legal material, but he was not written up or subject to any disciplinary action, and the legal materials that were improperly in that inmate's possession were not confiscated. (*See* Jett Decl., ECF No. 28-1, at 3.) On this basis, Meeks asserts that the search of his cell was pretextual and that the true reason for the search was to remove the ADA/CG from his possession.

On November 4, 2011, the plaintiff and the rest of the inmate population were informed that any inmate whose materials were seized from Meeks's cell in Unit 15 could go directly to Disciplinary Board Chairman Dennis Davis's office to retrieve it, but that they would be subject to disciplinary action if Meeks was not authorized to have their legal materials in his possession. Meeks alleges this action by Davis was also retaliatory and that it chilled the desire of all DSNF inmates to file any legal action and "turned many inmates against" Meeks. (ECF No. 28, at 8–9, ¶ 18.) The plaintiff also alleges that the seizure of the ADA/CG constitutes a direct violation of his right to access the court and impeded his ability to pursue the other ADA lawsuit in which he was involved.

The plaintiff alleges that the bathroom doors in Units 3 and 4 were reinstalled in early May 2012, but the plaintiff continued to be held in the "Sheltered Living Hospital Unit 15-A," in violation of the ADA.

Although he alleges that Christensen told him it was his decision to move the plaintiff to Unit 15, he alleges that Chris Abingambe was responsible for refusing to allow the plaintiff to return to the general population.

He alleges that on June 15, 2012, defendant Davis searched the computer at the plaintiff's assigned work station to determine if the plaintiff had used the state computer to conduct legal work. On Wednesday, June 27, Davis had an M.I.S. technician download the memory storage from the plaintiff's work computer. The information taken from the plaintiff's assigned work station was "carried away by correctional staff members." (ECF No. 28, at 11 ¶ 28.) The plaintiff does not indicate what this information was or that he was found to have improperly been doing legal work on his prison-work computer.

He further alleges that defendant Campbell came to the plaintiff's work station around this same timeframe in an attempt to intimidate him. She asked the plaintiff's supervisor to forbid the plaintiff from using the work computer for personal legal work. She also informed the plaintiff's supervisor that she should find another clerk because the plaintiff would soon be transferred to another facility.

Meanwhile, on June 19, 2012, the plaintiff requested and received extra library time on June 20, 2012 so that he could meet a Sixth Circuit filing deadline concerning his other lawsuit. A copy of the deadline notice was attached to his request for extra library time. On June 20, the plaintiff was working in the law library as authorized when defendant Campbell entered the library and demanded that the plaintiff leave immediately. She refused to look at the plaintiff's Sixth Circuit deadline notice or his written permission for extra library time. The plaintiff was permitted to go back to the library the next day, during his "regular" library hours. His regular library hours during that time period were from 7:30 to 10:30, Tuesday through Saturday. The plaintiff does not allege that being ejected from the library on June 20 impeded his ability to meet his filing deadline or otherwise prejudiced his pursuit of his legal claims.

The plaintiff pursued a grievance related to Campbell's ejecting him from the library on June 20. The grievance was rejected on the basis that there was essentially no dispute that Campbell was unaware that the plaintiff was authorized to be at the library on that particular afternoon.

The plaintiff alleges that, immediately following the grievance hearing, defendant Davis, a corporal with the Grievance Hearing Board, oversaw another search of the plaintiff's work area and found that the plaintiff had certain letterhead logos and letters of recommendation for inmates to the parole

board. The plaintiff implies but does not expressly state that these documents were work-related, because he worked for a pre-release class. (ECF No. 28, at 12 ¶ 33.)

Based on all these allegations, the plaintiff asserts that the defendants violated his rights under § 1983 and Title II of the ADA by retaliating against him and impeding his right of access to the courts through the seizure of discovery material that was pertinent to an ongoing ADA lawsuit, discriminating against him on the basis of his disability, failing to make a reasonable accommodation for his disability, and refusing his request for a "reasonable accommodation interactive process hearing." (ECF No. 28, at 20 ¶ 54.)

The plaintiff reiterates his claims against Commissioner Schofield in his amended complaint and asserts that both the Commissioner and defendant Jewel Steele are also personally liable to him based on "their imputed and actual knowledge of the infringements of the Plaintiff's constitutional rights, and they acquiesced sufficiently therein to support liability under § 1983." (ECF No. 28, at 22 ¶ 62.) With respect to Steele specifically, the plaintiff claims she is subject to personal liability for having "listened to Defendant/FSO/ADA Officer Mr. Mike Christensen, as evidenced by her actions toward the Plaintiff and her written responses and refusal to respond to the Plaintiff's requests for a reasonable accommodation interactive process hearing." (ECF No. 28, at 21 ¶ 60.)

At the time the plaintiff filed his amended complaint, in August 2012, he was still housed at DSNF. He was transferred to South Central Correctional Facility on October 24, 2012. (*See* ECF No. 53.)

The defendants filed their amended answer denying liability and asserting affirmative defenses. (ECF No. 175.) Thereafter, the defendants filed their motion for summary judgment (ECF No. 284) with a supporting memorandum of law (ECF No. 285) and various exhibits including excerpts from the plaintiff's deposition and affidavits from the defendants and others. Notably, the defendants did not file the separate statement of undisputed facts with their motion, apparently as a result of oversight. After the plaintiff pointed out this omission, the defendants later submitted a statement of undisputed material facts (ECF No. 317), to which the plaintiff never responded. The plaintiff filed his response in opposition to the motion (ECF No. 314), with attached exhibits, as well as his own affidavit (ECF No. 315) and those of several inmates (ECF Nos. 294–99), and a statement of disputed facts (ECF No. 316).

II.     **DEFENDANTS' STATEMENT OF FACTS**

Defendants' motion for summary judgment is based on the facts they claim are undisputed. These facts, for the most part, are supported by affidavits submitted by the defendants.

The defendants represent that Jennie Jobe, then warden at DSNF, had the bathroom doors removed from the plaintiff's unit on or around April 19, 2011, in order to deter the use of contraband in the bathrooms. According to Jobe and defendant Mike Christensen, Christensen was not involved in the warden's decision to remove the bathroom doors and lacked authority to have the bathroom doors removed. Jobe also rejected a grievance-board recommendation to put the doors back on.

Jobe further states in her affidavit that she made the decision to place Meeks in Unit 15 so he would have more privacy to use the bathroom in order to accommodate his paruresis. (Jobe Aff. ¶ 13; *see also* ECF No. 1-1, at 17 (8/30/2011 Memo to Meeks from Jobe, stating she made the decision to move him to Unit 15A to accommodate his need for bathroom privacy).) According to Jobe, after the plaintiff's move, he was allowed to keep his job placement, and his access to the law library and all other prison activities and programs remained the same.

Defendants assert that Dennis Davis did not disclose the plaintiff's paruresis at the group grievance hearing on May 17, 2011, and supports this statement with affidavits from Dennis Davis and two other DSNF employees who were at the grievance hearing. (Davis Aff. ¶ 11; Holt Aff. ¶¶ 7-8; Moody Aff. ¶¶ 7-8). These affidavits assert that the plaintiff himself openly disclosed he suffered from paruresis at the May 17, 2011 grievance hearing. The defendants also assert that Meeks never filed a grievance alleging that Davis improperly disclosed his confidential medical information. (Parker Aff. ¶ 3).

Defendants state that legal materials were confiscated from the plaintiff's cell on November 3, 2011 because the plaintiff was not an approved legal helper and his possession of the legal materials was in violation of TDOC Policy. The plaintiff was found guilty of a disciplinary infraction, and that decision was upheld on appeal. (Campbell Aff. ¶¶ 6-9, ¶¶ 10-12; TOMIS Printout of Disciplinary ID # 926304.)

Defendants state that, on June 20, 2012, Julia Campbell asked the plaintiff to leave the DSNF law library because she believed he was in violation of TDOC Policy. (Campbell Aff. ¶¶ 13–20; *see also* ECF No. 28-1, at 10 (unverified statement from law librarian).) The defendants also point out that plaintiff does not claim that being ejected from the law library that day impeded his ability to meet his Sixth Circuit filing

deadline.

Defendant Jewel Steele was appointed Warden of DSNF in September, 2011, after the previous Warden, Jennie Jobe, had the bathroom doors removed from units 3 and 4. (Steele Aff. ¶¶ 4–5.) Defendant Steele eventually had the bathroom doors in units 3 and 4 at DSNF replaced. (*Id.* ¶ 6). Steele denies having any personal involvement in the conduct alleged in the plaintiff's Complaint and Amended Complaint beyond responding in her official capacity as Warden to grievances and disciplinary appeals filed by Plaintiff. (*Id.* ¶ 7).

## III.    SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate where the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)).

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. *Id.* at 252. The court will view the summary judgment motion "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *McDonald v. Petree*, 409 F.3d 724, 727 (6th Cir. 2005) (citing *Celotex Corp.*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Leadbetter v. Gilley,* 385 F.3d 683, 689 (6th Cir. 2004) (quoting *Anderson*, 477 U.S. at 248–49). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249–50 (citation omitted).

Generally speaking, in resolving a motion for summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover. *Anderson*, 477 U.S. at 256. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Ky. Dep't of Transp.,* 53 F.3d 146, 149 (6th Cir.1995). The text of Rule 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

"In other words, the movant can challenge the opposing party to 'put up or shut up' on a critical issue." *BDT Prods. v. Lexmark Int'l*, 124 F. App'x 329, 331 (6th Cir. 2005).'

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. "[[I]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States*, 20 F.3d 222 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs.*, 854 F.2d 1179, 1181 (9th Cir.1988)). Rule 56(e) also has certain, more specific requirements:

> [It] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225–26 (citations omitted).

A verified complaint carries the same weight as would an affidavit for the purposes of summary judgment. *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (citing *Lavado v. Keohane,* 992 F.2d 601, 605 (6th Cir. 1993) (explaining that where a party files a verified complaint, the allegations contained therein "have the same force and effect as an affidavit for purposes of responding to a motion for summary judgment" (internal quotation marks omitted)). However, to create issues of material fact, the statements in an affidavit must be based on personal knowledge. *See, e.g.*, *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); Fed. R. Civ. P. 56(e). Accordingly, speculative and conclusory allegations, even if made within a verified complaint, are insufficient to withstand a motion for summary judgment. *See, e.g., Emmons v. McLaughlin*, 874 F.2d 351, 354–55 (6th Cir. 1989) (finding that vague and

conclusory allegations in an affidavit were insufficient to withstand summary judgment); *Bryant v. Kentucky*, 490 F.2d 1273 (6th Cir. 1974) (stating that conclusory allegations, without more, are not enough to survive summary judgment).

As a general matter, the judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## IV.    ANALYSIS AND DISCUSSION

The magistrate judge granted the motion to amend the complaint without conducting an initial review of the amendment. Thus, the fact that the initial order dismissed some claims and some defendants is not necessarily dispositive of whether the amended complaint successfully restated such claims. *Cf. LaFountain v. Harry*, 716 F.3d 944, 951 (6th Cir. 2013) ("[A] district court can allow a plaintiff to amend his complaint even when the complaint is subject to dismissal under the PLRA."). Accordingly, the first step in determining whether the defendants are entitled to summary judgment is to ascertain what claims, exactly, are pending.

In particular, the amended complaint continues to assert claims against Commissioner Schofield in his individual capacity, mostly concerning the Commissioner's failure to respond to letters of complaint and grievance appeals addressed to him by the plaintiff. Because the amended complaint does not include new material factual allegations concerning this defendant, however, the court will not revisit its initial determination that the complaint fails to state a claim against Commissioner Schofield in his individual capacity.

The amended complaint does contain new factual allegations against Chris Abingambe. These

claims were not addressed in the order granting the motion to amend the complaint, but the plaintiff never expressly pursued these claims and never effected service on Abingambe. The court therefore finds that, to the extent the plaintiff might have stated claims against Abingambe in the amended complaint, the claims against him must be dismissed for failure to prosecute and failure to effect service.

Otherwise, the court construes the complaint and amended complaint as asserting (1) First Amendment retaliation claims against defendants Mike Christensen, Dennis Davis, Julia Campbell, and Jewel Steele; (2) claims against TDOC under the ADA and the RA for disability discrimination and retaliation based on the actions of all the defendants as agents of TDOC; (3) a claim against Dennis Davis under § 1983 for alleged violation of the plaintiff's right to privacy; and (4) a claim against Julia Campbell under § 1983 for violation of the plaintiff's right to access the courts. The court will proceed to discuss each of these claims.

### A.      Section 1983 Retaliation Claims

As set forth above, the court construes the complaint and amended complaint as asserting claims under § 1983 against defendants Christensen, Campbell, Davis, and Steele for First Amendment retaliation.

To prove a retaliation claim, the plaintiff must establish that (1) he was engaged in protected conduct; (2) the defendants took an adverse action against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). That is, the plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Id.* at 399 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment. *Id.*

The plaintiff insists that the alleged retaliatory acts by the individual defendants cannot be considered separately but must be viewed in their totality as a "campaign of harassment." In support of this theory of recovery, he cites the case of *Bart v. Telford*, 677 F2d 622, 625 (7th Cir. 1982), in which the

circuit court found that the plaintiff successfully stated a claim for retaliation where she alleged that "the mayor and other defendants subjected her to a campaign of petty harassments in retaliation for her having run for public office." The district court initially found that the allegation of petty harassments amounted to *de minimis* injury that was not sufficiently serious to state a claim of constitutional dimension.

The Seventh Circuit disagreed:

> It is true that a certain air of the ridiculous hangs over the harassment allegations. . . . But we cannot say as a matter of law that the exercise of First Amendment rights by public employees cannot be deterred by subjecting employees who exercise them to harassment and ridicule through selective enforcement of work rules. The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable. Yet even in the field of constitutional torts *de minimis non curat lex*. Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise. . . However, more is alleged here—an entire campaign of harassment which though trivial in detail may have been substantial in gross. It is a question of fact whether the campaign reached the threshold of actionability under section 1983.

*Id.* at 625.

Notably, however, in that case the plaintiff appealed the dismissal of her complaint under Rule 12(b)(6) for failure to state a claim upon which relief could be granted, and she alleged that the defendants acted in concert at the behest of the mayor. Here, discovery has concluded and the defendants have filed a motion for summary judgment. Moreover, in order for the court to consider all of the plaintiff's various allegations in conjunction with each other, the court would effectively have to presume the existence of a conspiracy (the elements of which are not alleged) in order to impute to all defendants the acts of any of the defendants. The plaintiff has not provided any factual basis for making such an imputation. In addition, the events occurred in some cases many months separately from each other, and in retaliation, allegedly, for different events. The court therefore finds that it is inappropriate to consider all the allegations as supporting one retaliation claim. For the most part, the allegations against the separate defendants must be considered separately, except as noted below.

### 1. Mike Christensen

The plaintiff alleges that at the relevant time in 2011 he was involved in a lawsuit against TDOC asserting claims under the ADA, and that during the course of discovery proceedings in that case he had sought and obtained discovery of the ADA Compliance Guide ("ADA/CG") used by TDOC. The plaintiff

asserts that defendant Mike Christensen had specifically objected to providing this document to the plaintiff and that, after the plaintiff was permitted to discover it, his relationship with Christensen took a "serious downturn." (ECF No. 1, at 5 ¶ 2.) The plaintiff also alleges that Christensen was aware that the plaintiff suffered from paruresis. As set forth above, the defendants do not dispute that the plaintiff was involved in protected activity and that Christensen was aware of it. They do dispute that Christensen took any action that could be considered retaliatory in nature.

The plaintiff claims in his original or amended complaint that Christensen retaliated against him for his activities relating to the other lawsuit by (1) causing the exterior doors to be removed from the bathrooms in Unit 4, where the plaintiff was housed, in April 2011, (2) refusing to replace the doors to accommodate the plaintiff's paruresis, and (3) having the plaintiff transferred to Unit 15. In particular, the plaintiff claims that, when he pleaded with Christensen in early September 2011 to "simply replace one particular bathroom door" and allow the plaintiff to remain in Unit 4, Christensen told the plaintiff that as long as he was the "FSO/ADA Officer there will be no bathroom doors in Units 3 and 4. I made the decision to move you to Unit 15 and that is how it is going to stay." (ECF No. 28, at 6–7 ¶ 13.)

As discussed in connection with the standard of review applicable to summary judgment motions, a verified complaint functions as an affidavit and can serve to create an issue of fact. However, purely conclusory statements cannot create a material factual dispute. *Bryant v. Kentucky*, 490 F.2d 1273 (6th Cir. 1974). The plaintiff's claim that Christensen was responsible for the removal of the doors is just such a conclusory and unsupported statement, and it is refuted in the record both by Christensen's and Jobe's affidavits and by the plaintiff's own materials. (*See, e.g.*, ECF No. 1-1, at 3–4 (5/10/2011 Letter from D. Meeks to D. Schofield, claiming that Chris Abingambe had the bathroom doors removed, noting that Abingambe told him the warden had the doors removed, and expressing concern that Christensen had not talked with him about accommodating his disability).) The undisputed evidence is that Chris Abingambe made the initial recommendation to remove the doors in response to a problem with inmates smoking in the bathroom. The plaintiff does not allege that Abingambe was aware of the plaintiff's lawsuit or the discovery conducted therein, or that Abingambe had any particular motivation, in April 2011 when the doors were removed, to retaliate against the plaintiff. Further, regardless of who suggested or supported the decision, it is undisputed on the record that then-warden Jennie Jobe made the ultimate

decision to implement Abingambe's recommendation, and that only the warden had the authority to have the bathroom doors removed. In addition, the record shows that after several inmates brought grievances regarding the bathroom doors, the grievance committee recommended replacing the doors. The warden refused based on the pervasive use of contraband in the bathrooms. (ECF No. 285-11, Jobe Aff. ¶¶ 6–11; Inmate Grievance Response, ECF No. 101, at 8.) The decision to move the plaintiff to Unit 15 was also made by Jennie Jobe. (*See* 8/30/11 Memo from J. Jobe to Plaintiff, ECF No. 1-1, at 17; Jobe Aff. ¶ 13.)

In short, the undisputed evidence in the record shows that Christensen had no involvement in the initial decision to remove the doors. Further, regardless of what Christensen might have said to the plaintiff in August 2011, months after the doors had been removed and the warden had rejected the Grievance Committee's recommendation that they be replaced, there is no evidence in the record suggesting that Christensen had the authority to have the doors put back on or to move the plaintiff to Unit 15. The court finds that the plaintiff's contradictory and conclusory statements in his declaration and complaints do not create a material issue of disputed fact as to whether Christensen was authorized to make these decisions.

Rather, the undisputed evidence shows that it was Jobe's decision to remove the doors and to move the plaintiff to Unit 15. The plaintiff appears to assert that Jobe's decision to move him was motivated by his having complained about the removal of the bathroom doors to Commissioner Schofield, but Jennie Jobe is not named as a defendant in this action. The court finds that the plaintiff has failed to create a material issue of disputed fact as to the first part of the second element of his retaliation claim against Christensen—that Christensen took an adverse action against him. Christensen is therefore entitled to summary judgment in his favor as to the § 1983 retaliation claim.

### 2. Dennis Davis and Julia Campbell

The plaintiff's retaliation claims against defendants Davis and Campbell are based on two sets of events that occurred more than seven months apart. The first set of events is the alleged search and seizure of legal materials from the plaintiff's cell on November 3, 2011 by Campbell, and Davis's subsequently requiring the inmates whose documents were taken from Meeks to go to Davis to retrieve those documents. Meeks suggests this act had the effect of chilling those inmates' First Amendment rights as well as Meeks' First Amendment right to help them. The second set of events occurred in June

2012, when Davis and Campbell allegedly harassed the plaintiff with repeated searches of his work station.

a.   <em>November 3, 2011 Seizure of Legal Materials</em>

The first question raised by the allegations related to the November 3 search and seizure of documents from the Meeks's cell is whether the plaintiff was engaged in constitutionally protected activity. The plaintiff relies on *Thaddeus-X* in support of his claim that he had a constitutionally protected right to assist other inmates with their legal work. *See Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (holding that an inmate who assisted another inmate in filing a legal action was engaged in "protected conduct" for purposes of retaliation claim). Although *Thaddeus-X* supports the plaintiff's contention that an inmate providing legal assistance to another may be engaged in protected activity for purposes of a retaliation claim, it is also clear that a prisoner's right to assist other prisoners is not unlimited. Here, the defendants have shown that the plaintiff was not authorized to help the other inmates with their legal work and thus that his possession of their legal materials was a violation of department policy. A prisoner who is violating a legitimate prison regulation is not engaged in protected conduct. *Id.* at 394–95; *see also Smith v. Parker*, 7 F. App'x 432, 434 (6th Cir. 2001) (inmate helping other inmates with legal work was not engaged in "protected conduct" because he was not an approved legal helper authorized to perform legal work on behalf of other inmates).

The plaintiff attempts to refute this argument by claiming that the prison regulation he was initially charged with violating was not the same as the one he was convicted of and that he did not receive adequate notice of the claim against him. He asserts that if he had had adequate notice, he could have presented materials showing that the prior warden had authorized him to assist other inmates. The court's consideration of this argument, however, is barred by *Heck v. Humphrey*, 512 U.S. 77 (1994), in which the Supreme Court held that an inmate does not have a cognizable claim under § 1983 if the claim would invalidate his conviction or imprisonment. *Heck* has been applied to an inmate's § 1983 claim related to his prison disciplinary conviction as well. *See Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (holding that the plaintiff's § 1983 claim was not cognizable unless the inmate could show that the disciplinary conviction had been overturned).

Applied in this context, *Heck* means that a plaintiff is barred from pursuing a claim that, if

successful, would necessarily invalidate the grounds of a disciplinary conviction. *See Jackson-El v. Ray*, 201 F.3d 440 (Table), 1999 WL 1252877 (6th Cir. Dec. 15, 1999) (inmate's claim that an officer planted a knife in his cell in retaliation for the inmate's lawsuit against the Michigan Department of Correction was not cognizable because the inmate failed to show the disciplinary conviction he received for having the knife had been overturned); *Hartsfield v. Rivord*, 191 F.3d 452 (Table), 1999 WL 777658 (6th Cir. Sept 17, 1999) (inmate's claim that officers induced another inmate to throw feces on him and issued misconduct tickets against him in retaliation for his having filed grievances against the officers was barred as the inmate's claim called into question the disciplinary convictions of which he stood convicted). Accordingly, "[a] finding of guilt based upon some evidence of a violation of prison rules 'essentially checkmates [a] retaliation claim,'" *Burton v. Rowley*, 234 F.3d 1267 (Table), 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000) (quoting *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994)).

In the instant case, the plaintiff was convicted of the disciplinary offense of Violation of Institutional Policy based upon his having the legal materials in his cell. (Campbell Aff. ¶¶ 8-12; TOMIS Printout for Incident ID # 926304.) The plaintiff has not shown that this conviction was subsequently overturned. (*Id.*) Thus, the plaintiff's retaliation claim based on the confiscation of other inmates' legal materials fails because it would otherwise invalidate his disciplinary conviction based upon having the legal materials in his cell.

> b. *June 2012 Searches and Library Ejection*

The plaintiff alleges that defendant Davis conducted searches of the plaintiff's work station and computer on June 15 and 27 and July 10, 2012. Around the same time, on July 2, 2012, defendant Campbell allegedly came to the classroom where the plaintiff worked as a clerk and attempted to intimidate him by telling his supervisor to forbid him to work on personal legal matters on the state computer and that she needed to find a new clerk because the plaintiff was about to be transferred. In addition, Campbell ejected the plaintiff from the law library on June 20, 2012. On that day, the plaintiff had been excused from work because the class was cancelled and had received authorization to spend extra time at the law library because he had a looming filing deadline in the Sixth Circuit.

The plaintiff initially characterized these actions as impeding his access to the courts (discussed below), but in his response to summary judgment he made it clear that he believes the actions were

retaliatory. He does not indicate in what protected conduct he was involved in June 2012. His other lawsuit remained pending at that time, but the plaintiff does not allege that this fact provided a basis for Davis and Campbell to retaliate against him. Nor does the plaintiff allege that Campbell and Davis were motivated by his grievances concerning being housed at Unit 15. He seems to suggest that his grievances related to the earlier searches and to his ejection from the library motivated continued searches in retaliation for his grievance. Regardless, conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim. *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996). The court is not required to accept as true non-specific factual allegations and inferences or unwarranted legal conclusions. *See Dellis v. Corrs. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001). In the context of a retaliation claim, the Sixth Circuit has held "conclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial." *Murray v. Unknown Evert*, 84 Fed. App'x. 553, 556 (6th Cir. 2003). The court finds that the plaintiff has failed to adequately allege a retaliatory motive or to present facts giving rise to a reasonable inference of a retaliatory motive.

Moreover, even assuming that the plaintiff could establish that he was involved in protected conduct and that the defendants had some retaliatory motive, the court finds that the plaintiff cannot establish a retaliation claim based on the defendants' actions. Specifically with respect to the plaintiff's ejection from the law library, the evidence is undisputed that the plaintiff did in fact have authorization to be in the library at a time when he would normally have been at work. Nonetheless, the undisputed evidence also shows that Campbell was unaware of that fact until later. In addition, the plaintiff had regular law-library hours five days a week, and he does not allege that Campbell made a habitual practice of interfering with his regular library hours. Rather, the interruption that occurred on June 20 was a singular, unusual occurrence. The plaintiff does not allege that he was prevented from going back to the library at his regular time the following morning, that his ejection on June 20 interfered with his ability to meet his filing deadline, or that it in any way deterred his engagement in protected activities. Because Campbell reasonably believed the plaintiff was not authorized to be in the library at that time, her action in removing him cannot be deemed retaliatory.

Regarding the searches of the plaintiff's work station and computer by defendant Davis, the court

finds that these, at most, were *de minimis* actions that cannot be deemed adverse events of the type that would deter a person of ordinary firmness from engaging in that conduct. The plaintiff does not allege that he was at his work station when these searches occurred, that the searches yielded any material that was used against the plaintiff, or that he suffered any disciplinary action as a result of these searches. Even considered in conjunction with Campbell's allegedly coming to the plaintiff's place of work and telling his supervisor not to allow him to perform personal legal work on the state computer, these actions do not support a claim of retaliation.

### 3. Jewel Steele

The plaintiff's retaliation claim against Jewel Steele is based largely on her "listening" to Mike Christensen insofar as she did not put the doors back on the bathrooms of Unit 4 until months after she replaced Jennie Jobe as warden at DNSF, and her refusal to respond to the plaintiff's requests for an interactive hearing. Meeks also alleges that Steele can be held liable under § 1983 because of her "imputed and actual knowledge of the infringements of the Plaintiff's constitutional rights" and her "acquiesce[nce] therein." (ECF No. 28, at 22 ¶ 62.)

To establish the liability of any individual defendant, the plaintiff must show that that particular defendant was personally involved in the activities giving rise to the plaintiff's claims. *Rizzo v. Goode*, 423 U.S. 362, 371 (1976). *See also Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (noting that "[p]ersons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior"); *Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011) ("Personal involvement is necessary to establish section 1983 liability." (citing *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991)). Liability under §1983 must be based on active unconstitutional behavior and cannot be based upon a mere failure to act. *Shehee v Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

In the instant case, the plaintiff is unable to demonstrate that Steele was personally involved in any alleged violation of his constitutional rights. His disclaimers to the contrary notwithstanding, the plaintiff effectively seeks to impose *respondeat superior* liability against Steele without alleging her personal involvement in any unconstitutional conduct. The only direct allegation against Steele is that Meeks sent her a letter requesting an Interactive Process Hearing pursuant to the Equal Employment Provisions of the ADA, 29 C.F.R. § 1630.01, *et seq.*, to which she never responded. (ECF No. 28, at 20 ¶

55). As discussed below, the interactive process pertains to employment-related ADA claims, not to Title II ADA claims. Moreover, the filing of a grievance with a supervisory official is an insufficient basis upon which to establish liability for an alleged constitutional violation. *See Henry v. Pogats*, 35 F.3d. 565 (Table), 1994 WL 462129, at *2 (6th Cir. Aug. 25, 1994) ("A combination of knowledge of a prisoner's grievance and failure to respond or remedy the complaint is insufficient to impose liability upon supervisory personnel under § 1983."). Steele's testimony establishes that her only involvement in this matter was reviewing Meeks's disciplinary appeals and grievances in her official capacity as warden. (Steele Aff. ¶ 7). The plaintiff is unable to establish a claim against Steele under § 1983.

The court also notes that plaintiff's allegations against Steele relate solely to his rights under the ADA. As discussed in the initial review of the plaintiff's original complaint, the ADA does not provide for individual liability against government officials. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 808 (6th Cir. 1999). Steele therefore cannot be held liable for alleged violations of the plaintiff's rights under the ADA.

### 4. Conclusion: Retaliation

Considered separately or in their totality, the undisputed facts fail to support the plaintiff's § 1983 retaliation claims against defendants Christensen, Campbell, Davis, or Steele. The defendants are entitled to summary judgment in their favor as to these claims.

### B. The ADA Claims

As best the court can tell, the plaintiff's ADA discrimination claim is based on the initial removal of the bathroom doors, the failure to accommodate the plaintiff's alleged disability by replacing even one of the doors, the refusal to engage in the "interactive process" in order to decide on an appropriate accommodation, the transfer of the plaintiff instead to Unit 15, and the refusal to transfer him back to Unit 4 after the bathroom doors were finally replaced. The plaintiff seeks to bring claims against TDOC under Title II of the ADA for a failure to accommodate his disability and failure to initiate or engage in the interactive process. The plaintiff also asserts that he was subjected to retaliation in violation of the ADA both for pursuing a different ADA lawsuit against prison officials and obtaining discovery in that lawsuit, and for protesting the various actions that gave rise to this lawsuit. The plaintiff seeks both injunctive relief and monetary damages against TDOC, a state agency.

### 1.     *ADA Discrimination Claim*

The ADA prohibits "discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004). *See* 42 U.S.C. §§ 12111–12117 (Title I); 42 U.S.C. §§ 12131–12165 (Title II); 42 U.S.C. §§ 12181–12189 (Title III). Title V (Subchapter IV) sets forth various miscellaneous provisions, including the ADA's anti-retaliation provision, which provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203. *See Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007). The Supreme Court has recognized that Title II of the ADA applies to prisoners housed in state prisons. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998).

To prove a violation of Title II, the plaintiff must show: "[1] that he is a 'qualified individual with a disability,' [2] that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and [3] that the denial or discrimination was 'by reason of' his disability." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir.1996) (quoting 42 U.S.C. § 12132). Title II's implementing regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity." 28 C.F.R. § 35.130(b)(7).

The defendants here do not dispute that the plaintiff, for purposes of their motion for summary judgment, is a qualified individual with a disability. They do dispute that he was subjected to discrimination and that the discrimination was "by reason of" his disability. They argue first, however, that the Eleventh Amendment bars the recovery of damages.

The Supreme Court has held that, in some contexts at least, "Title II [of the ADA] authorizes suits by private citizens for money damages against public entities that violate § 12132." *United States v. Georgia*, 546 U.S. 151, 154 (2006) (citing 42 U.S.C. § 12133). The defendants nonetheless argue that the

plaintiff's ADA claims are barred by Eleventh Amendment immunity because they sound in equal protection rather than in due process, relying on *Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808 (6th Cir. 2002). The plaintiff responds that his claims also sound in due process.

In *Popovich*, construing the Supreme Court's decision in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), the Sixth Circuit indeed held that the Eleventh Amendment precluded damages for "an equal protection-type claim of discrimination" under Title II of the ADA, but that "Title II of the Disabilities Act is different from Title I. . . . Title II, dealing with 'services, programs, or activities of a public entity,' rather than employment, '"has somewhat different remedial provisions from Title I' and is not controlled by the Court's decision restricting equal protection claims against states." *Id.* at 813 (quoting *Garrett*, 531 U.S. at 360 n.1). This is because "Title II, unlike Title I, encompasses various due process-type claims with varying standards of liability and is not limited to equal protection claims." *Id.* A lot of water has flowed under the bridge since *Popovich* was issued, however. The Supreme Court has issued two decisions concerning Title II, *Tennessee v. Lane*, 541 U.S. 509 (2004), and *United States v. Georgia*, 546 U.S. 151, 154 (2006), and the Sixth Circuit recently revisited the issue in *Mingus v. Butler*, 591 F.3d 474 (6th Cir. 2010), clearly abrogating *Popovich*.

In *Lane*, the plaintiffs were paraplegics who sought damages and equitable relief under Title II, alleging that Tennessee and a number of its counties had denied them physical access to the state's courts. The Court held that Title II of the ADA constitutes a valid exercise of Congress's enforcement power under the Fourteenth Amendment, thus authorizing monetary damages, insofar as it applied to cases implicating the fundamental right of access to the courts. The Court implied that *Popovich* was correct insofar as the claim in that case, brought by a hearing-impaired parent who was denied full participation in child-custody proceedings because of the state court's refusal to accommodate his condition amounted to a substantive violation of his fundamental right to access the courts. The holding in *Lane* was fairly narrow: that "Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services." *Lane*, 541 U.S. at 531; *see id.* at 533–34. The Court also held that the state's duty to accommodate was not unlimited, but only required the states to take "reasonable measures" to remove barriers to accessibility. *Id.* at 531.

Subsequently, in *United States v. Georgia*, 546 U.S. 151 (2006), a paraplegic state prison inmate

brought suit under Title II. The Court again held that the ADA validly abrogates state sovereign immunity insofar as it "creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment." *Id.* at 159. The question, of course, is what conduct may be deemed "*actually*" to violate the Fourteenth Amendment. The plaintiff there alleged, among other things, that he was confined 23 to 24 hours per day to a 12-by-3-foot cell in which he could not turn his wheelchair around, that he was unable to use the shower or toilet without assistance, which was often denied, and had frequently injured himself trying to transfer to shower or toilet by himself and, alternatively, had been required to sit in his own waste while prison officials refused to help him clean himself. He also alleged that he had been denied physical therapy and medical treatment, and that he had been denied access to virtually all prison programs and services because of his disability. The parties did not dispute that these allegations stated a claim under § 1983 based on violation of the Eighth Amendment's prohibition of cruel and unusual punishment and also violated Title II. The Court therefore observed that the plaintiff's "claims for money damages against the State under Title II were evidently based, at least in large part, on conduct that independently violated the provisions of § 1 of the Fourteenth Amendment. In this respect, [the plaintiff] differs from the claimants in our other cases addressing Congress's ability to abrogate sovereign immunity pursuant to its § 5," including *Tennessee v. Lane. Id.* at 158 (internal citations omitted). The Court further noted that "no one doubts that § 5 grants Congress the power to 'enforce . . . the provisions' of the Amendment by creating private remedies against the States for *actual* violations of those provisions." *Id.* at 158 (citations omitted). The Court's holding was that, "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159.

The Sixth Circuit had the benefit of both *Lane* and *Georgia* when it issued *Mingus v. Butler*, 591 F.3d 474 (6th Cir. 2010). In that case, the plaintiff was a state prisoner who suffered from macular degeneration and other physical problems. Regarding the plaintiff's ADA claims, the court read *Georgia* as setting forth a three-part test for assessing a sovereign-immunity defense to a Title II ADA suit, which required courts to

> determine . . . on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth

Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Mingus*, 591 F.3d at 482 (quoting *Georgia*, 546 U.S. at 159).

Applying that test to the facts of the case before it, the Sixth Circuit noted that, for purposes of her motion for summary judgment, the defendant did not dispute that the plaintiff stated a claim for relief under Title II and also found that, because Mingus had not appealed the district court's finding that there was a genuine issue of fact with respect to the rational basis for the defendant's denial of his request for a single-occupancy room, the court accepted for appeal purposes that the plaintiff had "alleged misconduct that *actually* violated the Fourteenth Amendment—namely, treatment unequal to that received by other disabled inmates." *Id.* at 483. The court distinguished the case from *Popovich* on the basis that the plaintiff in *Popovich* made an "equal protection-type claim of discrimination," while the plaintiff in *Mingus* made a "traditional equal protection claim" subject to rational-basis scrutiny. Because the plaintiff had alleged conduct that actually violated the Fourteenth Amendment, the court was not called on to consider step three of the *Georgia* analysis.

The case before this court therefore requires application of the three-part test espoused by *Georgia* and recognized by *Mingus*, the first step of which requires the court to determine which of the plaintiff's allegations states a violation of the ADA. As set forth above, the plaintiff alleges that the removal of the bathroom doors, the refusal to accommodate his disability by replacing one of the bathroom doors, and the decision instead to move him to Unit 15, where he would have a toilet in his cell, violated the ADA. The plaintiff also alleges that the move to Unit 15 was discriminatory because the ADA forbids a medical placement where such a placement is unnecessary and that placement in Unit 15 had the effect of precluding his participation in prison programs and services that otherwise would have been available to him.

Regarding the initial removal of the bathroom doors and the defendants' refusal to put even one back on to accommodate the plaintiff's disability, the court finds based on the undisputed facts that this action was not intentionally discriminatory. As set forth above, it is undisputed that the original purpose for removing the doors, and Jobe's refusal to replace them despite the grievance committee's recommendation, was to address a problem of inmates smoking in the bathrooms. The decision was not

because of the plaintiff's alleged disability.

Moreover, with respect to the alleged failure to accommodate, neither the plaintiff nor the other parties has addressed the fact that, although the exterior bathroom doors were removed, the individual stall doors were not removed. The plaintiff does not devote any portion of his substantial filings to the question of how the removal of the exterior doors adversely affected his ability to urinate. He does not state that he actually suffered any problems in that regard, although he apparently lived without bathroom doors for at least four months before being moved to Unit 15. The court therefore finds that the prison's decision regarding the bathroom doors was not discriminatory and did not violate the ADA.

Possibly the most serious of the plaintiff's claims is the allegation that the move to Unit 15, which the prison claims was intended to accommodate his complaints about the bathroom doors, subjected him to discrimination on the basis of a perceived disability, because the plaintiff and other inmates in Unit 15 were excluded from participation in prison programs and services. However, the court finds that the undisputed facts refute the plaintiff's claim that placement in Unit 15 resulted in a the denial of access to prison programs and services available to the general population. The affidavit of Jennie Jobe establishes, and the plaintiff does not dispute, that after his move to the "medical unit," the plaintiff was allowed to continue his prison job, have access to the law library, and participate in the same activities he was allowed to participate in while he was housed with the general population in Unit 4. (ECF No. 285-11, at ¶ 14.)

The plaintiff attempts to show that the move to Unit 15 limited his access to prison programs by showing that inmates housed in Unit 15 were not permitted to attend the prison "field day" conducted on October 13, 2011. He presents a memorandum from a recreational therapist to Jewel Steele requesting approval for holding the event; this memorandum notes that "those people in [Unit] 15A/B and the Health Center may not sign up for any events [due] to medical reasons until an approved list has been given to the Recreation Department." (ECF No. 1-1, at 42.) Meeks also has filed six substantially identical affidavits[1] from inmates who attest that they were housed in Unit 15 in October 12, 2011 when Warden Jewel Steel "issued a blanket denial of all 'medical inmates' and inmates housed in U-15-A/B and the inmates housed in the Health Center from participation in the annual Inmate Field Day activities." (ECF

---

[1] One of these is the affidavit of Williams Shatswell who, defendants claim, was not at DSNF on October 13, 2011.

Nos. 294, 295, 296, 297, 298, 299, at ¶ 4.) The inmates aver generally that inmates housed in Unit 15 "are on a regular basis excluded from any programs or activities enjoyed by other general population inmates at DSNF." (*Id.* ¶ 5.)

Regarding these affidavits, the court finds, first, that the allegations of exclusion from "any programs and activities" are too vague to create a genuine issue of material fact. Moreover, the alleged exclusion of "medical" inmates from participation in the Field Day activities on one particular day in October 2011 is a trivial and non-actionable event. It was not an educational program, did not affect release or parole eligibility, and was simply one recreational event. Critically, Meeks does not allege that he had participated in the annual field day in prior years or that he sought but was denied participation in 2011. And finally, the court observes that there is no allegation that Unit 15 and medical inmates were not allowed to *attend* the event, only that they were not allowed to participate. The court therefore finds, despite allegations that inmates in Unit 15 were not allowed to participate in field day, that Meeks has failed to establish a material issue of disputed fact regarding whether he was excluded from prison programs and services that were available to the general population of prisoners, either by reason of his perceived disability or as a result of being housed in Unit 15.

The plaintiff's claim that the prison violated 42 U.S.C. § 12112(b)(5)(A) and 29 C.F.R. § 1630.9 by ignoring his request for a reasonable accommodation is not actionable because the referenced provisions fall under Title I of the ADA, not Title II.

However, the plaintiff also alleges that it was *per se* discriminatory and a Title II violation to house him in Unit 15, because this amounted to placement in a "designated medical area" even though he was not actually receiving care or treatment, in violation of the express terms of 28 C.F.R. § 35.152(b)(2)(ii), which states: "Unless it is appropriate to make an exception, a public entity . . . [s]hall not place inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment. . . ." The defendants' response to this argument is that this placement was a reasonable accommodation to Meeks' claimed medical condition.

The court finds that, at the most, Meeks might have established a disputed issue of fact as to whether he was entitled to an injunction requiring the prison to permit him to move back to Unit 4 (or the general prison population) and out of Unit 15, but for the fact that Meeks is no longer housed at DSNF.

He was transferred to a different prison in October 2012. The defendants argue and Meeks concedes that, because of this transfer, he is not entitled to injunctive relief. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir.1996). TDOC is entitled to summary judgment in its favor and dismissal of the plaintiff's claim for injunctive relief under the ADA.

However, assuming that the transfer to Unit 15 constituted a violation of 28 C.F.R. § 35.152(b) and thus a *per se* violation of Title II of the ADA, the question is whether this is the type of violation that may give rise to damages that may be assessed against the State. The second step of the *Georgia* test comes into play at this juncture. In that regard, however, the plaintiff has not alleged that the activity in question also independently violated rights protected by the Eighth or Fourteenth Amendment. His allegations certainly would not substantiate a finding that he has suffered cruel and unusual punishment, nor has he shown a violation of his right to access the courts, or to due process. As the defendants argue, the plaintiff basically alleges that his placement in the medical unit violated his rights under the ADA because he was denied the equal privileges and benefits he had while housed in general population, and that such claims sound in equal protection.

That the claims sound in equal protection is not necessarily dispositive, as established by *Mingus*. The question is whether the plaintiff's allegations state an independent violation of his rights under the Fourteenth Amendment. As the defendants argue, prison inmates have no constitutional right to placement in any particular prison or to placement in any particular section within the prison. *Williams v. Bass*, 63 F.3d 483, 485 (6th Cir. 1995); *Hewitt v. Helms*, 459 U.S. 460 (1983); *Meachum v. Fano*, 427 U.S. 236, 242, (1976); *Ward v. Dyke*, 58 F.3d 271 (6th Cir. 1995). Inmates also have no liberty interest in the procedure affecting their classification because the resulting restraint does not impose an atypical and significant hardship in relation to the ordinary incidents of prison life. *Sandin v. Conner*, 515 U.S. 472, 486 (1995). As discussed above, Meeks has not actually shown that his placement in Unit 15 affected his access to prison programs and services that were available to the general prison population. Meeks does not argue that he was treated differently than similarly situated inmates. The court therefore concludes that the plaintiff's allegations do not show that he was subjected to an independent violation of his Fourteenth Amendment rights for purposes of the *Georgia* three-prong test.

Having answered "no" to the question posed by the second step of the *Georgia* test, the court

must consider the third step, which requires the court to consider, insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. *Georgia*, 546 U.S. at 159. Neither the Supreme Court nor the Sixth Circuit has provided any guidance as to how this inquiry should be conducted or what factors are to be considered in making this determination. However, the Supreme Court and the Sixth Circuit have held that prison administrators should be afforded deference in the execution of practices that, in their judgment, are needed to preserve internal order and discipline and to maintain institutional security. *See Ward v. Dyke*, 58 F.3d 271, 273 (6th Cir. 1995) (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). *See also Skelton v. Pri-Cor Inc.*, 963 F.2d 100, 103-04 (6th Cir. 1991). In light of these important considerations and the fact that the plaintiff has not remotely shown that he was harmed in any way by the conduct at issue, the court finds that this conduct was not sufficiently egregious to warrant abrogation of sovereign immunity, even assuming that it amounts to a *per se* violation of the ADA. Thus, defendant TDOC is entitled to sovereign immunity from damages with respect to this claim, and the court will grant summary judgment to TDOC on the plaintiff's ADA damages claim as well as on the claim for injunctive relief.

### 2.  *ADA Retaliation Claim*

The plaintiff cannot state an ADA retaliation claim against the individual defendants. *Cf. Key v. Grayson*, 163 F. Supp. 2d 697, 704 (E.D. Mich. 2001). However, the court must still consider whether defendant TDOC is entitled to summary judgment on the retaliation claim asserted against it as an entity. In that regard, the court finds that the claims against TDOC are premised upon essentially the same allegations as those supporting the § 1983 retaliation claims against the individual defendants. Further, the analysis of retaliation claims under § 1983 and the ADA is the same. *Cf. Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997) ("Retaliation claims are treated the same whether brought under the ADA or Title VII."). Accordingly, TDOC is entitled to summary judgment in its favor for the same reasons that the individual defendants are entitled to summary judgment as to the § 1983 retaliation claims against them.

Moreover, even if the plaintiff were able to establish the elements of an ADA retaliation claim, he would still be barred by sovereign immunity from recovering damages against TDOC, for the same

reasons discussed above in connection with his ADA discrimination claim: he has not established an independent violation of his constitutional rights. *United States v. Georgia*, 546 U.S. 151, 154 (2006). The court will therefore grant summary judgment in favor of defendant TDOC as to the plaintiff's ADA retaliation claim.

### C.    The RA Claim

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To establish a claim under the Rehabilitation Act, a plaintiff must prove (1) that he is a "handicapped person" under the Act; (2) that he is "otherwise qualified"; (3) that he is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of his handicap; and (4) that the program or activity receives federal funds. *Burns v. City of Columbus,* 91 F.3d 836, 840–41 (6th Cir. 1996) (citing *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988)). If a plaintiff establishes a *prima facie* case under the RA, the burden shifts to the defendant to show that the defendant's decision was reasonable under the circumstances. *Id.*

Generally speaking, because both the RA and the ADA prohibit discrimination on the basis of disability, the jurisprudence regarding both statutory schemes has developed in tandem, and the claims are frequently considered as coextensive with each other. *See, e.g.*, *Thompson v. Williamson Cnty.*, 219 F.3d 555, 557 (6th Cir. 2000) (given the similarity between the ADA and the RA, claims brought under both statutes can be analyzed together); *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997) ("Because the standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other.").

There are several important distinctions between the two statutes, however. First, as the defendants point out, RA claims against the state are not barred by the Eleventh Amendment. *Nihiser v. Ohio*, 269 F.3d 626, 628 (6th Cir. 2001). And second, the "solely because of" language in the RA imposes a higher burden of proof upon the plaintiff. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314–15 (6th Cir. 2012).

For the same reasons as those discussed above in connection with the ADA claim, the court finds that the plaintiff cannot show he was discriminated against *solely* because of his alleged handicap. The bathroom doors in the plaintiff's unit were originally removed pursuant to the prison's valid penological interest in deterring the use of contraband in the unit, not because of the plaintiff's medical condition. (Jobe Aff. ¶¶ 5–7; Davis Aff. ¶ 5; Christensen Aff. ¶ 7). The plaintiff's allegations do not show that the other actions of which he complains were motivated in any part by his alleged disability. Moreover, generally claiming that a particular accommodation is unreasonable fails to state a claim for monetary relief under the RA. And, as set forth above, injunctive relief is unavailable because the plaintiff is no longer housed at DSNF Unit 15. *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir.1996).

In addition, the plaintiff cannot establish a retaliation claim under the RA, because, although the RA incorporates the anti-retaliation provision of the ADA by reference, it does so only insofar as such actions relate to employment. 29 U.S.C. § 794(d). *Cf. Maxwell v. South Bend Work Release Ctr.*, No. 3:09-CV-008-PPS, 2011 WL 4688825, at *9 (N.D. Ind. Oct. 3, 2011) ("Section 794(d) . . .section applies only to a "complaint alleging employment discrimination. . . ."); *see also Dyrek v. Garvey*, 334 F.3d 590, 597 n.3 (7th Cir. 2003) ("[T]he standards set out in the ADA are used in determining whether a violation of the Rehabilitation Act occurred in the employment context.")

The defendants' motion for summary judgment as to the RA claim will be granted.

**D.      Right-to-Privacy Claim**

The plaintiff alleges that defendant Dennis Davis disclosed the plaintiff's medical condition, paruresis, to other inmates at a group grievance hearing on May 17, 2011 (ECF No. 1, at 7), in violation of his fundamental right to privacy. *See Moore v. Prevo*, 379 F. App'x 425, 427–28 (6th Cir. 2010) (holding that an inmate has a constitutional privacy right guarding against disclosure of his sensitive medical information to other inmates).

In support of their motion for summary judgment on this claim, the defendants submit several affidavits in which witnesses employed by TDOC attest that Meeks himself, and not Davis, openly disclosed his medical condition during the grievance hearing. (ECF Nos. 285-8, 285-9 (Affidavits of Debra Moody and Natasha Holt).) These affidavits do not dispose of the question, because the plaintiff's verified complaint contains a non-conclusory statement based on the plaintiff's personal observation that

contradicts the defendants' affidavits, giving rise to a disputed issue of fact as to whether Davis made the allegedly improper disclosure.

The defendants also argue, however, that this claim is subject to dismissal because the plaintiff did not exhaust his administrative remedies. In support of this argument, the defendants proffer the affidavit of Ty Parker, Grievance Chairman at DSNF, who attests that Meeks never filed a grievance at DSNF relating to this claim. (*See* ECF No. 285-10, Parker Aff. ¶ 3.) The plaintiff, in his response, concedes that he failed to file a grievance or otherwise pursue administrative remedies regarding this claim. He insists that such failure is immaterial in this case, because (1) medical-related complaints are non-grievable under TDOC policy; (2) there was no grievance procedure in place for making an ADA-related grievance, in violation of the ADA itself; and (3) the ADA does not require exhaustion of administrative remedies.

The plaintiff's creative arguments to the contrary notwithstanding, the court finds that the claim at issue here is neither a "medical-related" claim nor a claim arising under the ADA. Instead, it is a § 1983 claim for violation of a right to privacy protected by the Fourteenth Amendment. Thus, the plaintiff's arguments as to why the exhaustion requirement should not apply to this claim are completely beside the point.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires prisoners to properly exhaust all available administrative remedies prior to filing suit in federal court. *See id.* ("No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). Exhaustion is mandatory and cannot be excused by the district court. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). Unexhausted claims may not be considered and must instead by dismissed. *Jones v. Bock*, 549 U.S. 199, 923–24 (6th Cir. 2007). The plaintiff concedes that this claim is unexhausted and does not offer any legitimate basis for waiving the exhaustion requirement. The court therefore finds that this claim is subject to dismissal for failure to exhaust. The defendants' motion for summary judgment as to this claim will therefore be granted.

### E. Access-to-the-Courts Claim

The defendants argue that the plaintiff cannot establish a claim for violation of his right to access

the courts because such a claim requires a plaintiff to show that his access to the courts was actually impeded. *See Stanley v. Vining*, 602 F.3d 767, 770 (6th Cir. 2010) (an inmate claiming a violation of his fundamental right to access the courts must show that some action by the defendants actually "hindered his efforts to pursue a legal claim" (quoting *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). In response, the plaintiff disclaims any intent to bring an access claim and instead re-emphasizes his intent to bring retaliation claims. (*See* ECF No. 314, at 23 ("Instead of being *denied* access to the courts, the prisoner is penalized for actually exercising that right." (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999))).)

Based on the plaintiff's concession that his access to the courts was not impeded and that he did not intend to bring an access claim, insofar as the amended complaint may be read to state such a claim, the defendants are entitled to summary judgment in their favor and dismissal of this claim.

V.      **CONCLUSION**

For the reasons set forth herein, the plaintiff's motion to amend his complaint (ECF No. 320), the additional motions asking that the court grant that motion (ECF Nos. 353, 355), his motion for a copy of the ADA Compliance Guide (ECF No. 356), and the defendants' motion to strike the declaration of William Shatswell (ECF No. 303) will be all be denied.

Further, the defendants' motion for summary judgment will be granted and this matter dismissed. The court will adopt the R&R insofar as it reaches the same conclusion, and will overrule the plaintiff's objections to the magistrate's recommendation that the defendants' motion for summary judgment be granted.

An appropriate order is filed herewith.

_____
Aleta A. Trauger
United States District Judge